IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CITIZENS IN CHARGE, MIKE GROENE, and DONALD SLUTI, | ) ) ) | |
| Plaintiffs, | ) ) | 4:09CV3255 |
| LIBERTARIAN PARTY OF NEBRASKA and LIBERTARIAN NATIONAL COMMITTEE, | ) ) ) ) | |
| Plaintiff-Intervenors, | ) ) | AMENDED MEMORANDUM AND ORDER |
| v. | ) ) | |
| JOHN A. GALE, in his official capacity as Secretary of State of the State of Nebraska, | ) ) ) ) | |
| Defendant. | ) ) ) | |

This matter is before the court following a trial in this case. Plaintiffs and intervenors brought this action to enforce their First Amendment rights of political free speech. Plaintiffs and the intervenors request that this court enter a declaratory judgment finding the defendant violated their rights pursuant to the First and Fourteenth Amendments to the United States Constitution. The court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

**A.  The Parties**

Plaintiff Citizens in Charge is an educational not-for-profit that is dedicated to protecting and expanding ballot initiative and referendums in Nebraska and other states. The members include citizens in both Nebraska and other states. Plaintiffs Donald Sluti ("Sluti") and Mike Groene ("Groene") are Nebraska residents and registered voters.

Groene assists with securing petitions and Sluti is an independent who wants to run for office.  Secretary of State for Nebraska John Gale is the defendant.  The intervenors are the Libertarian Party of Nebraska and Libertarian National Committee, Inc.  The intervenors are a grass roots organization with nationwide membership, and the members would like to hire out-of-state paid petition circulators to assist with the forming of a new political party that is recognized by the State of Nebraska through the petition process.  The Libertarian Party of Nebraska is a group of voters from the State of Nebraska.

### B.  Residency Requirement

On February 6, 2008, the Nebraska Unicameral passed Legislative Bill 39, and on February 19, 2008, the bill became law.  This law went into effect on July 18, 2008.[1]  The law stated in relevant part that "only an elector of the State of Nebraska may qualify as a valid circulator of a petition and may circulate petitions under the Election Act."  Neb. Rev. Stat. § 32-629(2).  "Elector" is defined as:

> Elector shall mean a citizen of the United States whose residence is within the state and who is at least eighteen years of age or is seventeen years of age and will attain the age of eighteen years on or before the first Tuesday after the first Monday in November of the then current calendar year.

Neb. Rev. Stat. § 32-110.

The plaintiffs/intervenors offered evidence that the out-of-state ban increases the time and costs of conducting a petition campaign in Nebraska.  Filing No. 74:  Declaration of Gene Siadek ("Siadek Decl.") ¶ 11; Declaration of William Redpath ("Redpath Decl.") ¶¶ 55-69;  Benedict  Decl.  ¶  23;  Declaration  of  Michael  Arno  ("Arno  Decl.")  ¶¶  16-29;

---

[1]The governor vetoed Legislative Bill 39 on the following grounds:  "[T]he restrictions proposed by Legislative Bill 39, when coupled with the signature threshold requirements that exist in current law, would unfairly inhibit the ability of citizens to petition their government.  I do not believe that we should enact additional barriers to the power of the initiative and the referendum that are reserved for the people in Article III of the Nebraska Constitution."  (Nebraska Legislative Journal, 100th legislature, 2d session, February 13, 2008, 584.)  The Unicameral overrode the governor's veto.

Declaration of Mary Baggett ¶¶ 10-18; Declaration of John Hassett¶ 9; Declaration of Arenza Thigpen ("Thigpen Decl.") ¶¶ 9-13; Second Siadek Decl. ¶ 24; Second Jacob Decl. ¶¶ 7, 22-29; Declaration of Scott Kohlhaas ("Kohlhaas Decl.") ¶¶ 17-18, 23-26; Declaration of Diann Gentry ("Gentry Decl.") ¶¶ 10-12; Declaration of Michael Groene ¶ 10; Declaration of David Nabity ¶¶ 10-13.[2]   The defendant disagrees and likewise has provided calculations to the court supporting its argument that there is very little in increased costs. See Filing No. 102, pp. 41-42, ¶ 4; p. 45, ¶ 3.   The court credits the evidence and testimony of the plaintiffs and intervenors in this regard, and finds there are increased costs associated with using untrained solicitors.

At the time in question in this lawsuit there were no petitioning companies devoted to initiative, referendum, and/or recall petitions.[3]   There are 1,344,978 potential eligible voters in Nebraska available to circulate petitions and witness the signatures of petition signers.  There are 1,000 potential individuals in the State of Nebraska with at least some experience in circulating petitions.

According to the parties, a nonresident may:  1) solicit signatures from Nebraska residents, 2) talk to Nebraska residents about the nature and benefits of particular petition efforts, 3)  carry petitions with them, 4) advise petition proponents who are from Nebraska about the best way to carry out their duties, and 5) perform any other duties in connection with  petition  circulation.  However,  a  nonresident  cannot  witness  signatures.  Under

---

[2]The court notes that objections have been filed by the defendant as to a number of documents filed by plaintiffs and intervenors.  See Filing No. 91 and Filing No. 92.  These objections are based on foundation, hearsay, relevance, speculation and legal conclusion.  The court is aware of these objections and has taken them into consideration while reviewing the evidence. *See Harris v. Rivera*, 454 U.S. 339, 346 (1981) (in a bench trial the court is presumed capable of hearing evidence otherwise inadmissable and ignoring that evidence when making decisions).

[3]There are a couple of companies who run petition drives for gaming and KENO.

Nebraska law, "[e]ach circulator of a petition shall personally witness the signatures on the petition and shall sign the circulator's affidavit."  Neb. Rev. Stat. § 32-630(2).  Thus, nonresidents cannot witness signatures.

The plaintiffs and intervenors argue that the out-of-state ban severely burdens the right to associate for political purposes.  They contend that there has been no stateside petition effort in Nebraska since the imposition of the residency requirement, in contrast to the 70% success rate noted by the Eighth Circuit in *Initiative & Referendum Inst. v. Jaeger,* 241 F.3d 614 (8th Cir. 2001) (discussed hereinafter), a case that originated in North Dakota with a similar ban on out-of-state petition circulators.  The out-of-state ban prohibits the plaintiffs and intervenors from relying on nonresident professional petition circulators.

In 2010 the Libertarian Party implemented a petition drive for one of its candidates.  The intervenors contend they were forced to pay one of the KENO companies extra money to assist with this drive.  AGT, the KENO petition circulation company, initially intened to decline to help, but later agreed to do so.  This company is geared towards gaming and KENO issues, and not towards initiatives of this type.  In 2010, AGT refused to carry out any petitioning work for the recall of the Omaha mayor.

The State of Nebraska contends that the Unicameral passed this law in part to prohibit signature fraud.  The State only offered three instances of potential petition process fraud from 1995-2010.  One perpetrator was from Nebraska, one was out of state, and the residence of the remaining person is unknown.  There is no further evidence of any significant petition fraud in Nebraska by out-of-state residents.

Further, the State of Nebraska also contends that it is difficult to timely subpoena out-of-state circulators.  The State argues that at times it only has a two-week window for determining the validity of a petition, and it is difficult to obtain service and return the petition circulator in that period of time.  Plaintiffs and intervenors argue that the State of Nebraska could locate or prosecute nonresident petition circulators.

All petition circulators in the State of Nebraska must submit each petition page for verification to the Secretary of State, and on the affidavit must list his or her name, street and number and city.  See Neb. Rev. Stat. § 32-628(3).  According to the plaintiffs and intervenors, this should enable the State of Nebraska to find out-of-state petitioners.  In fact, in the case where Nebraska charged an out-of-state petition circulator with falsifying signatures on the petitions, Sergeant Sandra Meyers of the Lincoln Police Department used the home address in Oklahoma which had been provided on the affidavit to locate the person charged with fraud.  Filing No. 81, Ex. 40, Deposition of Sandra Myers ("Myers Dep") 36-40; 52-55.  However, it took the Tulsa police more than a year to serve the warrant on the fraud perpetrator.  Filing No. 81-2, Ex. 40.

Mr. Lawrence Neal Erickson, Assistant Secretary of State for Elections for fifteen years and considered the election expert for the State of Nebraska, testified that he knew of no instances in which an out-of-state petition circulator was subpoenaed to Nebraska but could not be found.  Filing No. 81, Attach. 1, Ex. 39, Deposition of Lawrence Neal Erickson ("Erickson Dep.") 164.  According to Mr. Erickson, the Secretary of State's signature verification process is "very reliable."  *Id*., Erickson Dep. 17-18, 42, 128-29.

The plaintiffs and intervenors offered declarations of numerous persons who testified that very few people are effective petition circulators.  *See* Siadek Decl. ¶¶ 7-8,

Filing No. 40; Filing No. 74:  Siadek Decl.; Redpath Decl. ¶¶ 25-26; Second Declaration of Gene Siadek ¶ 33, Docket No. 74-4; Arno Decl. ¶ 14, Docket No. 74-6; Thigpen Decl. ¶ 11, Docket No. 74-9; Ferrell Decl. ¶¶ 7-13, Docket No. 74-14; Erickson Dep. 22-23, 157-58. Further, plaintiff and intervenors contend that many people will not circulate petitions under any circumstances.  Filing No. 74, Attach. 1, Redpath Decl. ¶ 25; Filing No. 81, Myers Dep. 17-18.

Plaintiffs and intervenors also assert that professional petition circulators are experienced and know how to obtain the required number of signatures in a specific amount of time.  Filing No. 74, Redpath Decl. ¶¶ 18-22; Benedict Decl. ¶¶ 19-22;  Arno Decl. ¶¶ 12-15; Thigpen Decl. ¶ 11; Kohlhaas Decl. ¶¶ 10-14, 21-22; Declaration of Darryl Bonner ¶¶ 15-16, Bonner Decl.; Declaration of Andrew S. Jacobs ¶¶ 16-17, Jacobs Decl.; Declaration of Mark Read Pickens ¶¶ 21-22, Pickens Decl.; Ferrell Decl. ¶¶ 7-13; Gentry Decl. ¶¶ 2-7; Erickson Dep. 117 (higher signature validity rates for petition drives by paid circulators than those done partly or entirely by volunteers); Filing No. 81-2; deposition of John Hassett 77-78, 116-18 ("Hassett Dep.") (higher signature validity rates for professional circulators compared with nonprofessional circulators);.

The State of Nebraska has not passed legislation that would require petition circulators to agree to be subject to the State's jurisdiction as a condition of circulation.

Approximately 5934 signatures were necessary to form a new political party under Neb. Rev. Stat. § 32-716 in 2010 and about 4,000 signatures  necessary to place a partisan candidate on the statewide general election ballot under Neb. Rev. Stat. § 32-618(2).

The plaintiffs and intervenors offered evidence of perceived animus against out-of-state petitioners.  See Ex. 5, Memo to Government Committee Members, Filing No. 55 at ID # 456-57 (sets out purposes of out-of-state ban but does not mention intent to reduce signature fraud); Filing No. 81, Ex. 39 Erickson Dep. 89-93.  Some of the legislative history reads as follows:

> We support LB39 . . . for the very reason that something needs to be done . . . not [to] have the big money outsiders come in, hire what we call the carpetbaggers, put them out on the street, house them and harass the citizens. . . .

Ex. 5, Hearing Before the Government, Military and Veterans Affairs Committee, January 17, 2007, p. 11 (statement of Pat Loontjer), Filing No. 55-1 at ID # 465.

> They came in and for $1 million it is sad to say you can almost buy your way onto a Nebraska ballot. That is certainly not what our founding fathers wanted when they initiated the petition process.  It's been so distorted that it ties the hands of the average citizens.

*Id.*

> I really do want to . . . cut down on the money that comes in from out of state.

Ex. 5, Hearing Before the Government, Military and Veterans Affairs Committee, January 17, 2007, p. 14 (statement of Kathy Holkeboer), Filing No. 55-1 at ID # 468.

> [W]hen paid petitioners come in from outside and a lot of outside money comes in to fund that that it in a sense kind of tilts the playing field so that the ordinary citizen effort can't compete and the big money interests on the outside really have an advantage in what I see often as meddling in our own business that really has nothing to do with the outside interest[.]

Ex. 5, Hearing Before the Government, Military and Veterans Affairs Committee, January 17, 2007, p. 33 (statement of Senator Avery), Filing No. 55-1 at ID # 487.

> [T]he people in Nebraska do not and are not interested in having people from out of state harassing them at Wal-Mart, K-Mart or wherever they are. . . .

> They have no idea about what is the issue of Nebraska. . . . [T]he simple fact
> is it was out-of state people, it was millionaires putting money in to tell
> Nebraskans what to do.  That's wrong.

Ex. 5, Senate Floor Debate, February 1, 2007, p. 8 (statement of Senator Harms), Filing

No. 55-2 at ID # 505.

> I understand the intention that we want to keep rich folks from outside the
> state from coming in here and influencing our public policy, but there is a
> ruling by a high court that indicates that it would be an abridgment of the
> constitution.  And so in a sense, our hands are tied. . . .

Ex. 5, Senate Floor Debate, February 1, 2007, p. 15 (statement of Senator Fulton), Filing

No. 55-2 at ID # 512.

> I think, by and large, most of us want to preserve the petition process for
> Nebraskans. . . .

Ex. 5, Senate Floor Debate, February 1, 2007, pp. 21-22 (statement of Senator Schimek),

Filing No. 55-2 at ID # 518-519.

> I have seen the people's house so abused by paid hired guns who parachute
> in and then run away.

Ex. 5, Senate Floor Debate, February 19, 2008, p. 17 (statement of Senator White), Filing

No. 56-1 at ID # 595.  Mr. Erickson testified that the out-of-state ban is good policy, stating:

"out-of-state circulators, in particular, don't understand the issues, don't convey them to

potential signers in a manner that really informs them as to what they're signing."  Filing

No. 81, Ex. 39, Erickson Dep. 72-73.  He did not testify regarding any fraud concerns.

On the other hand, these comments were made by Senator Lathrop during the floor

debate on LB 39:

> Thank you very much, Madam President and colleagues.  I would like to
> echo the remarks of Senator Adams, who correctly pointed out that the
> debate here and what we should focus on in our remarks, I think, is whether
> or not there is an evil we are trying to correct.  The law is very clear that we

have to choose the most narrow manner for limiting the process available to us to address a compelling interest, and that narrow process, I believe the use of the term "electorate" is as narrow as we can be with the problem that we are trying to correct or the evil that we're trying to correct in the petition process.  The reported cases require that we have a compelling interest, and I think that it would do us well to include in our debate the compelling interest —those things that are problematic, the fraud that we have seen, that we've heard about in these committee hearings and that accompany the introduction of this bill.

Floor Debate on LB 39, 100th Leg., 1st Sess.  Filing No. 55-3 at 10 #552.  Likewise,

Senator Schimek stated:

> And one of the reasons that I think that we should keep it in, and I asked to have the severability clause added, is because during the course of our discussion in the petition task force, while we were talking about the potential for fraud, two election commissioners who serve on that task force were very concerned about the fact that last time when we had the term limits petition drive in this state there were a number of instances, and here in Lancaster County, in which people came into the state, registered at a motel and then registered to vote, and then circulated petitions. And immediately upon turning in the signatures for that petition drive they left the state, they were gone.  And there was no way to trace them and there was no way to investigate the potential fraud.

Floor Debate on LB 337, 94th Leg., 1st Sess.  Filing No. 66-2 at ID #1637.

> At the risk of sounding too much like I'm preaching or too much like a school teacher here, I would tell you don't come to the microphone and say we don't want outsiders in our state because we don't like outsiders or we don't like what they have to say.  That's the wrong reason.

Ex. 5, Senate Floor Debate, January 15, 2008, p. 53 (statement of Senator Adams), Filing

No. 55-3 at ID # 546.

### C.  Scarlett Letter Provision

In 1995 the Unicameral passed a bill requiring that the paid circulator language must

appear in red ink and sixteen-point type.  Neb. Rev. Stat. § 32-628(4).  Plaintiffs and

intervenors contend that this is offensive, coerced speech.

Subsection 4 of Neb. Rev. Stat. §  32-628 provides as follows:  "Each sheet of a petition shall have upon its face and in plain view of persons who sign the petition a statement in letters not smaller than sixteen-point type in red print on the petition.  If the petition is circulated by a paid circulator, the statement shall be as follows:  This petition is circulated by a paid circulator. If the petition is circulated by a circulator who is not being paid, the statement shall be as follows:  This petition is circulated by a volunteer circulator."  This is the only part of the Election-Act Petitions that must appear in red type.  Neb. Rev. Stat. § 32-628(4).

Plaintiffs and intervenors challenge this provision.

## CONCLUSIONS OF LAW

### A.  Residency

The law requires that only electors of the State of Nebraska may circulate petitions under the Election Act.  Plaintiffs and the intervenors argue this imposes residency requirements on petition circulators, because petitions circulated by nonresidents will be declared invalid.  The plaintiffs and intervenors argue that circulation of petitions is core political speech.  The residency requirement imposed by Legislative Bill 39 applies to new party petitions, candidacy petitions and to initiative or referendum petitions.

Neb. Const. art. VI, § 1 states:

> Every citizen of the United States who has attained the age of eighteen years on or before the first Tuesday after the first Monday in November and has resided within the state and the county and voting precinct for the terms provided by law shall, except as provided in section 2 of this article, be an elector for the calendar year in which such citizen has attained the age of eighteen years and for all succeeding calendar years.

10

Plaintiffs and intervenors believe the Nebraska statutes make it impossible to gather signatures. Plaintiffs state:

> At issue are three provisions of Nebraska law: Neb. Rev. Stat. § 32-618(2)(a), Neb. Rev. Stat. § 32-628(2), and Neb. Rev. Stat. § 32-628(4). The second requires petition circulators to be "electors" of the State of Nebraska.  The third requires all petitions to contain certain language in large, red type.  The plaintiffs claim that these provisions violate various rights guaranteed by the First and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983, and they ask this Court for declaratory and injunctive relief prohibiting state officials from enforcing the unconstitutional statutes now and in the future.[4]

Filing No. 1, Complaint, page 1.  Plaintiffs seek to enjoin enforcement of Neb. Rev. Stat. § 32-629(2).[5]

The State has a right to regulate elections to ensure they are fair and orderly. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).  The court agrees that circulation of petitions is core political speech involving "interactive communication concerning political change" "for which the First Amendment protection is 'at its zenith.'" *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186 (1999) (*quoting Meyer v. Grant*, 486 U.S. 414, 422 (1988)). Colorado had an extensive law on petition circulators. The Supreme Court in *Buckle*y reviewed the provisions dealing with registration (that circulators must be registered voters), badge (language denoting whether the circulator was

---

[4]The first provision set out a signature-distribution requirement for would-be independent candidates, requiring them to obtain at least 50 signatures from at least one-third of Nebraska's counties on a candidacy petition before they may appear on the ballot.  However, since the filing of this lawsuit, the Nebraska Unicameral repealed this section of the statute.  Consequently, the merits of this claim are no longer at issue in this lawsuit.

[5]At the time of filing this lawsuit, plaintiffs argued that they wanted to field Libertarian Party candidates for the November 2010 election, and they wanted to hire a petition-gathering firm to collect signatures.  It appears that at least some of these circulators would have been paid and would have been nonresidents. The court notes that this is an issue that is capable of repetition yet evading review.  *Norman v. Reed*, 502 U.S. 279, 288 (1992).

paid or volunteer), and disclosure requirements (regarding amount of money paid to each circulator). The Supreme Court has determined that there must be vigilance in making judgments on the First Amendment, so as not to inhibit the exchange of ideas or political conversations. *Meyer*, 486 U.S. at 421. The *Buckley* court concluded that the voter registration requirement reduces the number of persons, both volunteer and paid circulators, that would be in the pool to circulate petitions. *Buckley*, 525 U.S. at 193. Further, the Supreme Court upheld the requirement that each circulator must submit an affidavit with his or her name and address, so as to subject the circulators to subpoenas if the need arises. *Buckley*, 525 U.S. 193-197. The *Buckley* Court further determined that Colorado's interests, administrative efficiency, fraud detection, and informing voters, did not justify the restrictions set forth by the Colorado election laws. *Id.* at 192.

In determining whether the law violates the plaintiffs' and intervenors' rights to associate, the United States Supreme Court has set forth the following test with regard to states' election laws:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). When the law imposes a reasonable and nondiscriminatory restriction, the State's regulatory interests are generally sufficient to justify such restrictions. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (*quoting Anderson*, 460 U.S. at 788. However, when there is a heavy burden or discrimination with

reference to these rights, the regulation must be narrowly drawn and there must be a compelling interest. *Id*. at 434 (*quoting Norman v. Reed*, 502 U.S. 279, 289 (1992).

The United States Supreme Court has stated that the freedom to associate as a political party is a fundamental right. *Williams v. Rhodes*, 393 U.S. 23, 40 (1968). As Justice O'Connor recognized in *Clingman v. Beaver*, "applying heightened scrutiny helps to ensure that such limitations are truly justified and that the State's asserted interests are not merely a pretext for exclusionary or anticompetitive restrictions." 544 U.S. 581, 603 (2005) (O'Connor, J., concurring). Voters are free to join together to create a common goal or agenda. *See Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) ("Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views."); *Norman v. Reed*, 502 U.S. 279, 288 (1999) (same). Under the *Anderson* and *Burdick* balancing tests: the court must first determine whether it is a burden; if the answer is no, the inquiry stops. If the response is yes, the court must determine if it is it narrowly tailored to serve compelling state interests. *Anderson v. Celebrezze*, 460 U.S. at 789; *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).

The court finds that the ban is subject to strict scrutiny. *Buckley*, 525 U.S. at 204; *see also Meyer*, 486 U.S. at 423 (applying strict scrutiny where, as here, a ban on nonresident petition circulators "has the inevitable effect of reducing the total quantum of speech on a public issue"). In *Buckley*, the Supreme Court applied strict scrutiny to Colorado's voter registration requirement for initiative-petition circulators finding it decreases the pool of potential circulators and the numbers of people who might be interested in spreading the message. *Buckley*, 525 U.S. at 194-95. The court further found

that the law was not narrowly restricted to achieve any compelling state interest argued by the state. *Id*.

Further, as in *Meyer*, the requirement "imposes a burden on political expression that the State has failed to justify." *Meyer*, 486 U.S. at 428. In addition, this court agrees with the plaintiffs and intervenors that their right to associate for political purposes is violated. *Rhodes*, 393 U.S. 23. The court finds that the plaintiffs and intervenors have established the first prong and have showed an infringement on their rights to associate. Plaintiffs' and intervenors' argument that this ban inhibits their right to associate is a valid one. The out-of-state ban imposes a heavy burden on the plaintiff-intervenors efforts to promote their political views in Nebraska. The defendant has not met its burden in this regard. As stated previously herein, the defendant offered very few instances of fraud. Further, there are less restrictive alternatives for bringing petition circulators into the subpoena jurisdiction of this court.

The majority of circuit courts that have reviewed similar restrictions, applied strict scrutiny, and have made the same determination. *See Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008) (Ohio statute imposing a residency and voter registration restriction on candidate-petition circulators violated free speech rights and the circulation activity constituted core political speech and was not narrowly tailored to achieve a compelling state interest); *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008) (Arizona statutes creating a residency restriction on candidate-petition circulators placed a severe burden on First Amendment rights and was not narrowly tailored to serve the asserted interest of preventing fraud in the election process); *Yes on Term Limits v. Savage*, 550 F.3d 1023 (10th Cir. 2008) (Oklahoma ban on nonresident petition circulators was not narrowly

tailored to the interests of protecting and policing the integrity and reliability of the initiative process); see *also Daien v. Ysursa*, 711 F. Supp. 2d 1215 (D. Idaho 2010) (court found that Idaho statute requiring residency for petition circulators unconstitutional).

However, defendant argues that *Jaeger* is dispositive of this case.  Defendant contends the Eighth Circuit Court of Appeals in *Jaeger* found that the North Dakota residency requirement, which had a law similar to the one in this case, was valid.  The Eighth Circuit noted that *Buckley* struck down the voter registration requirement but was not asked whether the residency requirements for petition circulators were permissible.  *Buckley*, 241 F.3d at 616.  The Eighth Circuit based its finding in part by determining that North Dakota had a compelling interest in preventing fraud.  *Jaeger*, 241 F.3d at 616.  The court in *Jaeger* did not specifically determine if the residency requirement was narrowly tailored, but it did cite to two district court decisions that so found.[6]  See *Jaeger*, 241 F.3d at 617 (citing *Kean v. Clark*, 56 F. Supp.2d 719 (S.D. Miss. 1999) and *Initiative & Referendum Institute v. Secretary of State of Maine*, 1999 Westlaw 33117172 (D. Me. April 23, 1999)).  Several other district courts have recently found that similar restrictions do not violate the First Amendment.  *See Libertarian Party of Virginia v. Virginia State Board of Elections*, 2010 Westlaw 3732012 *8 (E.D. Va. September 16, 2010) (no severe restriction on First Amendment rights when "out-of-district supporters" could work on candidate's campaign and "assist in circulating his petition, so long as someone eligible to vote in the Eighth Congressional District accompanied them and was present to witness any voters' signatures."); *but see Lux v. Rodrigues*, 736 F. Supp.2d 1042 (E.D. Va. August 26, 2010)

---

[6]The Eighth Circuit recently had an opportunity to revisit the *Jaeger* case, but dismissed the case for lack of standing.  *Constitution Party of South Dakota v. Nelson,* No. 10-2910 (8th Cir. May 4, 2011).

(citing *Jaeger* discussion of alternative means available to nonresidents to communicate their views) (recently reversed by *Lux v. Judd*, 2011 WL 2624173 (4th Cir. July 6, 2011) and remanded to the district court to review the residency requirement on its merits; *Constitution Party of South Dakota v. Howe*, 730 F. Supp.2d 992 (D.S.D. August 4, 2010) (no First Amendment violation where state did not prohibit plaintiff "from accompanying other circulators and speaking with potential voters about the candidate." Defendant relies on *Jaeger* and asks the court find it dispositive on the claims in this case. The court disagrees and finds that *Jaeger* does not control on this issue.[7] During the preliminary injunction hearing, the court determined that *Jaeger* would most likely apply. However, the court had received insufficient evidence at that time and *Jaeger* appeared to control. Following the submission of evidence and argument, the court believes that *Jaeger* is distinguishable. The Eighth Circuit in *Jaeger* specifically stated that there was "no evidence in the record" of the alleged burden associated with the ban. *Id*. at 618.

The court believes that the plaintiffs and intervenors have met their burden in this regard. The plaintiffs and intervenors have offered evidence of increased cost; evidence of the ability of trained solicitors to come in and do the job in the time permitted, and how training new solicitors is an increased cost burden; offered evidence as to a reduction of the available pool of circulators if only in-state petitioners are used; offered evidence as to the lack of any petition circulation firms in the State of Nebraska, other than those who petition for KENO issues; the Libertarian Party showed that there are very few instances

---

[7]*Jaeger* is the only Court of Appeals case that has upheld a residency restriction on petition circulators to date. The plaintiffs and intervenors argue that the *Jaeger* case is wrongly decided. That argument must be presented to and decided by the Eighth Circuit and clearly is not for this court to decide.

16

of fraud in Nebraska, and only one in the last 15 years by someone from out of state; and offered evidence that the Libertarian Party has limited resources for these campaigns, which could cause the Libertarian Party to not participate in petition drives in Nebraska. For these reasons, the court finds *Jaeger* is distinguishable. The plaintiffs and intervenors provided sufficient evidence of a real burden on their First Amendment rights.

Moreover, the court finds that there are less restrictive ways to meet the ability to subpoena out-of-state residents, such as a consent to jurisdiction requirement, or by the affidavit containing the necessary personal and geographical information. *See Buckley, 525 U.S. at 196* ("the interest in reaching law violators . . . is served by the requirement . . . that each circulator submit an affidavit setting out, among several particulars, the address at which he or she resides, including the street name and number, the city or town, [and] the county."). *Buckley* clearly articulates that this is a less restrictive means for obtaining jurisdiction over out-of-state petitioners. *Id*.

Other courts of appeal have held that the consent to jurisdiction option is clearly a less restrictive alternative than the residency requirement. *See Brewer, 531 F.3d at 1037 (9th Cir. 2008); Chandler v. City of Arvada, 292 F.3d 1236, 1242-45 (10th Cir. 2002); Krislov v. Rednour, 226 F.3d 851, 866 n.7 (7th Cir. 2000); see also Daien, 711 F. Supp. 2d at 1235; Frami v. Ponto, 255 F. Supp. 2d 962, 970 (W.D. Wis. 2003)*.

### B.  Scarlet Letter Provision

Formerly, from 1986 till 1988, Nebraska law prohibited payment to petition circulators. These prohibitions were struck down by the Supreme Court in *Meyer v. Grant, 486 U.S. 414*.  In 1991 the Nebraska Unicameral passed legislation requiring that the

petitions have language stating:  "This petition is circulated by a paid circulator."  Filing No.

56-2.  This law was later amended so as to require red ink and large font.

Plaintiffs and intervenors contend that the language placed on the petition is

pejorative.  Pejorative language is disfavored.[8]   *Cook v. Gralike*, 531 U.S. 510, 524-26

---

[8]In addition to the language quoted previously by members of the Unicameral, the record is replete with additional comments from members of the Unicameral about their feeling for paid circulators.

> [W]e have, as a Legislature, for many years taken a dim view of paid petition circulators and had banned those by statute, not allowed for paid petition circulators, and then the court struck down not only our law but every law in the country that did not allow for paid petition circulators.  So we have struggled with how to identify paid petition circulators and legislation a few years ago I introduced would have had them wear a big badge saying "Paid Petition Circulator" and, again, there was a constitutional question raised with that and so we came to the conclusion, the compromise of at least including on the petition some identification that this was a paid circulator . . . we at least have red ink, some way to particularly draw attention to the fact that these are paid circulators.  If we can't ban them, if we have to allow for them, at least the public should know that that's who they are dealing with.  It makes a difference to people I think.  If somebody comes up and they're legitimately, personally concerned about an issue and asking for somebody to sign a petition, that's one thing, but it's another if somebody is getting paid 75 cents or a dollar a signature trying to collect money as they collect signatures and I think the public reacts appropriately . . . having the red ink might help draw attention to the fact, so we've had people somewhat abusing the previous law we passed by hiding that information. . . .

(Ex. 9, Senate Debate, March 13, 1995, p. 2480-81 (statement of Senator Wesely), Filing No. 65-3 at ID # 1538-9.)

> [N]ow that we have paid circulators, the monied interests will be able to very easily to get upon the initiative ballot their propositions.  And those propositions are not necessarily going to be good for the general public even in the event of volunteer groups.

(Ex. 9, Senate Debate, March 13, 1995, p. 2499 (statement of Senator Beutler), Filing No. 65-3 at ID # 1557. 1569.)

> [We need to] protect our state from these transient bounty hunters that come in and are paid so much per signature to make quick money. . . .

(Ex. 9, Government, Military & Veterans Affairs Committee Hearing, February 1, 1995, p. 97 (statement of Patty Hansen), Filing No. 65-2 at ID # 1501.)

> I know that there are some people on the floor who place a paid circulator probably somewhere beneath an attorney even.

(Ex. 9, Senate Debate, March 24, 1995, p. 5178 (statement of Senator Witek), Filing No. 66-2 at ID # 1639.)

> [A warning about paid petition circulators is about] . . . protecting our process . . . from those people who really don't care what happens in the State of Nebraska, except if they're paid while they're here.

18

(2001) (labels placed next to candidate's name on ballots found to violate the First Amendment). Paid circulators, argue plaintiffs and intervenors, receive derogatory labels that nonpaid circulators do not receive. Plaintiffs and intervenors contend they cannot effectively reply to these derogatory labels. In addition, the plaintiffs and intervenors argue that the red letter language is not justified by any governmental interest. *See Cook*, 531 U.S. at 532; and *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Plaintiffs and intervenors also argue that this is compelled speech. Finally, the plaintiffs and intervenors argue that the scarlet letter provisions violate the Equal Protection clause of the Fourteenth Amendment, as the provisions bear no rational relationship to a legitimate state interest.

The first justification provided by the defendant is that the State of Nebraska wants to provide the electorate with information so they can choose to decide whether to sign or not. Second, the State argues this will help deter circulation fraud.

Plaintiffs disagree and ask the court to rely on *Cook* and *Mosley*, which state: where "the State has chosen one and only one issue to comment on"—here, the paid versus volunteer status of circulators—"the State is saying that the issue . . . is paramount." *Cook*, 531 U.S. at 532. The State "may not select which issues are worth discussing or debating." *Id*. (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)). The two justifications set forth by defendant do not survive the rational basis test, argue plaintiffs and intervenors.

---

(Ex. 9, Senate Debate, March 24, 1995, p. 5177 (statement of Senator Wickersham), Filing No. 66-2 at ID # 1638.)

The record reflects that, since 1996, while the disclosure has been required to be placed on petitions, 42 petition drives submitted petitions to the Secretary of State for signature verification.  Erickson Affidavit at 2,  3 and Attachment A (Filing No. 73-1, Ex. 12). Of those 42 petition drives, 34 were successful in placing issues, candidates, or parties on the ballot, including all six petition drives undertaken by the Libertarian Party.  Erickson Affidavit at Attachment A (Filing No. 73-1, Ex. 12); Erickson Dep. (Filing No. 81-1, Ex. 39), 153:11-15.  The majority of these successful petition drives used paid petition circulators. Erickson Dep. (Filing No. 81-1, Ex. 39), 152:24-153:7.

The court finds the disclosure statement does not impose a severe burden on plaintiffs' and intervenors' First Amendment rights.  Neither the plaintiffs nor the intervenors offered any significant or substantially credible evidence that the required language, color and type impaired their ability to obtain signatures.  Further, the court finds that the disclosure statement is a reasonable and a nondiscriminatory regulation designed to inform petition signers that the person gathering the petition signatures might be paid for such signatures.  The court does not find that this is a pejorative label or compelled speech, but instead concludes that this language is intended merely to inform the electorate of the paid or volunteer status.  Such information is "justified based on a governmental interest in 'provid[ing] the electorate with information.'" *Citizens United v. Federal Election Comm'n,* 130 S. Ct. at 914 (quoting *Buckley,* 424 U.S. at 66).  And finally, the court finds that the disclosure does not violate the Equal Protection clause.  The plaintiffs have offered no evidence that they are a protected class.  *See Jaeger,* 241 F.3d at 618.

THEREFORE, IT IS ORDERED that:

1.  The defendant's objection to evidence, Filing No. 91, is denied, as set forth in footnote number 2.

2.  The provision of Neb. Rev. Stat. § 32-629(2) is declared unconstitutional.  The State of Nebraska is enjoined from enforcing Neb. Rev. Stat. § 32-629(2).

3.  The red letter and type size set forth in Neb. Rev. Stat. § 32-628(4) are held constitutional and will not be enjoined.

4.  A separate judgment will be entered in accordance with this Memorandum and Order.

5.  The plaintiffs and intervenors shall have 21 days from the date of this order to file a motion for attorney fees and costs, if they choose to do so.  Defendant shall have 21 days thereafter to respond to plaintiffs' and intervenors' motions for attorney fees and costs.

DATED this 30th day of August, 2011.

BY THE COURT:


s/ Joseph F. Bataillon
Chief United States District Judge

---

[*]This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.